## SUPERIOR COURT

Nellie M. Carpenter et als  
        vs.            P.A.63  
Benjamin S. Carpenter, Ex.  
RESCRIPT  
September 16, 1924

This is an apepal from a decree of the Probate Court of the Town of South Kingstown admitting to probate an instrument purporting to be the last will and testament of Wanton R. Carpenter, late of said South Kingstown, deceased, as and for the last will and testament of said Wanton R. Carpenter. The appeal is now heard upon the proponent's motion for a new trial after verdict against the will.

At the trial the opponents based their opposition to the probate of the will upon the following grounds:

1. That the will was not executed according to the requirements of our Statutes of Wills in that it was not signed or acknowledge by the testator "in the presence of two or more witnesses present at the same time."

2. That at the time of making the will the testator did not have testamentary capacity.

3. That the will was procured to be made and executed by the testator under and through the undue influence of Arthur B. Carpenter.

The will is dated July, 1917, and purports to have been signed by the testator in the presence of Joseph B. Nichols and Arthur W. Steadman "in the presence of the testator and in the presence of each other." The testimony shows that the will was drafted by Nathan B. Lewis, Esq., under instructions given by the testator and by the latter taken to the office of Mr. Steadman's store in the village of Wakefield, where it was executed. The witnesses to the will differ radically with respect to the manner and form of the execution, Nichols testifying that the three, the testator and the two witnesses were together and signed in the presence of one another, and Steadman testifying that only the testator and himself were present when he signed as witness, and that the testator did not then and never had signed the will or acknowledged the will in the presence of himself and Nichols present at the same time.

Joseph B. Nichols, one of the witnesses, was a relative of the testator and testified that on the day of July

9th, 1917, Arthur B. Carpenter, son of the testator, called for him at his home and carried him in his automobile to Mr. Steadman's store, telling him that his father desired to meet him there; that when he arrived at Mr. Steadman's store he met the testator and went into the office of the store with him; that in the presence of himself, Mr. Steadman and Mr. Lewis, the testator signed the instrument declaring it to be his last will and testament, and that at the testator's reuest he and Mr. Steadman signed the will in the presence of the testator and in the precence of each other and of Mr. Lewis. The testimony of this witness was considerably weakened by the fact that a few weeks prior to the giving of this testimony, he testified in the Probate Court of the Town of South Kingstown, where the will was presented for probate, that he could not recall whether or not Mr. Steadman was present at the execution of the will, and could not remember whether or not Mr. Lewis was there at that time. His explanation of the discrepancy was that at the time of giving his testimony in the probate court he had not thought over the matter and that since that time as he thought upon the subject he was sure that Mr. Steadman and Mr. Lewis were present in the office of the store at the time of the signing of the will by the testator. He also testified that the attestation clause or the substance thereof was read to the witnesses at the time of the execution, although apparently he had testified in the probate court that he did not know whether or not the clause had been read.

Mr. Steadman, the other witness, on the other hand, testified that the testator came into his store on the morning of July 9th, 1917, unaccompanied by any other person; that they proceeded into Mr. Steadman's office where the testator asked Mr. Stead-

man to sign his will as a witness; that the will was then already signed by the testator and by Mr. Nichols; that he remarked to the testator at the time that Mr. Nichol's signature was already upon the will, and that he signed the will in the presence of the testator but that neither Mr. Nichols nor Mr. Lewis was then present. He further testified that Mr. Nichols and he at the time of the execution of the will, and for a long time prior thereto, had not been on friendly terms, and that Mr. Nichols had not spoken to him, or been in his store, for the past ten or twelve years. Mr. Steadman's testimony was positive, clear and direct, and was not weakened either on cross-examination or otherwise.

These witnesses were supported in their different versions of the circumstances of the execution of the instrument offered for probate, each by the corroborative testimony of another witness.

Nathan B. Lewis, Esq., former Justice of the District Court of the Second Judicial District, who drafted the will, testified that he was present at its execution in the office of Steadman's store on July 9th, 1917, and that the will was signed by the testator and by Mr. Nichols and Steadman, all present together at the same time. Judge Lewis's testimony was vigorously attacked on cross-examination and in the argument on the ground of defective memory due to his great age. At the time of the trial he was eighty-one years of age and apparently had given testimony in the Probate Court conflicting in a measure at least with testimony given at the trial, having testified to the jury positively that the will was executed in the office, while apparently he had testified in the Probate Court that it was executed out of the office and upon the counter of the store proper.

On the other hand Mr. Charles E. Caswell, a meat cutter in the Stead-

man store occupied a position therein about opposite the office door, testified that neither Judge Lewis nor Mr. Nichols was present in the office at the time of the execution of the will. He saw the testator and Mr. Carpenter enter and leave the office, and although he was unable to state the date, he fixed the occasion by the fact that on their return from the office Mr. Steadman informed him that he had just signed Mr. Carpenter's will as a witness. He corroborated Mr. Steadman's testimony that Mr. Nichols was not on friendly terms with Mr. Steadman and had not been in the store for many years.

In this state of the evidence on this question the case went to the jury. On the one hand, in support of the will is prima facie evidence contained in the attestation clause of the will itself which is subscribed by both witnesses and which recites that the will was signed by the witnesses in presence of each other; the rather evasive and shuffling testimony of Mr. Joseph B. Nichols, impeached by his conflicting testimony given in the Probate Court; and the clear and positive testimony of Judge Lewis, weakened, in a degree at least, by his lack of memory and the conflict between his testimony at the trial and that at the hearing in the Probate Court. On the other hand, against the will is the clear and convincing testimony of Mr. Arthur W. Steadman, an important merchant and a substantial citizen of Wakefield; the positive and unimpeached testimony of Mr. Charles H. Caswell; and the circumstances testified to by Mr. Steadman and Mr. Caswell and admitted by Mr. Nichols that the relations between Mr. Steadman and himself were of an unfriendly character, tending in a measure to render unlikely the presence of Mr. Nichols in Mr. Steadman's store.

The jury rendered a verdict against the will and in my opinion the verdict is in accordance with a fair preponderance of the testimony. Mr. Nichols' testimony was entirely unsatisfactory, and Judge Lewis', while unquestionably honest, appeared to me to be predicated upon his general practice and habit rather than upon his positive recollection of the events. The memory of neither of them was of a high character and both of them may easily have been mistaken. On the other hand the testimony of Mr. Steadman is either true or false and cannot be the result of a mistake. It is scarcely possible that these witnesses could have forgotten Mr. Nichols' presence in the store, if he were present, in view of the fact that he was not on speaking terms with Mr. Steadman and had not been in his store for a number of years. Furthermore he gave a detail of the meeting, namely, his statement to the testator, "that I see you have already Joseph Nichols' name on your will as a witness," which must have been entirely a fabrication unless it was a truthful statement of what occurred—it could not have been a mistake due to failure of memory.

With respect to the newly discovered evidence I do not regard this as sufficiently strong to justify setting aside the verdict. The affidavit setting forth the newly discovered evidence is the affidavit of Joseph T. Northup, which states that the affiant saw Joseph B. Nichols in conversation with Wanton R. Carpenter on the day of the execution of the will near the Steadman store. This testimony is merely cumulative and is not sufficiently conclusive to bring it within the exception to the rule which makes cumulative evidence newly discovered an insufficient basis for granting a new trial. Potter vs Padelford, 3 R. I. 162, 166—Heaton vs. Manhattan Fire Insurance Company, 7 R. I. 502.

Upon the questions of testamentary capacity and undue influence the preponderance of the evidence is not so

manifest, although in my opinion the verdict was warranted, at least upon the ground of undue influence. In view, however, of my opinion upon the question of the formal execution of the will it is unnecessary, the verdict being a general verdict, to go fully into these questions. The will was manifestly an unfair will with respect to the sons, Wanton and Roy, and to the widow, more particularly to the widow, of the deceased. The latter had worked to an extraordinary degree for her husband during their married life, a period of forty odd years, and had aided him to a large extent in accumulating the considerable estate which he possessed at the time of his decease. She brought up with the same care which she bestowed upon her own child the children of the testator by a former marriage, and while performing the usual household duties of their home, worked at the same time in the fields of the farm, cared for the cattle, managed the testators' hotel when he kept the hotel, performed all the duties of the post office while he was postmaster, and in every way by her economy and prodigious energy and labor helped her husband to acquire the property which was undertaken to be distributed by the instrument offered for probate as her husband's will.

At the time of the marriage the testator had comparatively slight means and died, leaving an estate estimated at from $100,000 to over $125,-000. The married life of the parties was comparatively harmonious, only one or two quarrels having occurred in the long period of their married life, even these quarrels, if they were quarrels, being established by testimony of very doubtful value. The sons, Wanton and Roy, equally with Arthur, worked for their father from early childhood until they came of age, and after they had attained their majority responded at all times to his call for assistance.

By the will Mrs. Carpenter was left $5000 in money and real property consisting of the homestead in such a delapidated condition of repair that nearly the whole of the $5000 in money will be necessary for its restoration; Wanton was left $500 in money and real property said to be worth $1000, and Roy was left $1000 in money and real property estimated to be worth about $15,000. All the rest and residue, amounting to between $75,000 and $100,000, was left to Arthur.

The evidence affords no explanation of the startling inequalities of the will. Arthur was not particularly a favorite son. Indeed, none of the children appeared to be especially favored by their father. Wanton at one time had incurred his father's disapprobation in consequence of his drinking habits. Many years before the execution of the will, however, Wanton had reformed and been restored to his making of the will seemed to be as well regarded by the father as were any of the sons.

The testator was an old man at the time of the execution of the will, nearly 80 years old. In his day he had been a shrewd trader, making it his business to attend all auction sales for miles around and reselling his purchases to advantage. As well as trading in this way he was a horse trader, a dealer in cattle and a farmer. A few years before the date of the execution of the will he had sustained quite severe injuries in two accidents closely following each other, and witnesses called by the opponents of the will expressed at the trial the opinion that he had failed noticably in mind and memory after these accidents. According to the testimony, after the execution of the will, he told one witness that he had not made a will; to another he said that he had provided well for his wife in his will; and to another he said that after his death, his wife would be the richest

woman in South Kingstown. There was considerable testimony of this character. Among the instances testified to by the witnesses showing the extent of the impairment of the testator's memory and the confusion of his mind following the accidents and about the time of the making of the will, were the following: On one occasion he went to the Wakefield bank to deposit a considerable sum of money and returned without making the deposit, having forgotten the purpose of his visit and left the pocketbook containing the money upon the desk of the bank, which resulted in its total loss. On another occasion he stated that he owned and spoke of owing to a certain person the sum of $500.00, until his wife explained to him that the contrary was true and that instead of owing $500.00 to the person in question that person owed him $500.00.

There was no direct testimony, as there rarely is in this sort of contest, of undue influence exerted upon the testator by Arthur. The evidence showed, however, that without any grounds therefor, Arthur was bitterly hostile to Mrs. Carpenter and although meeting her frequently at her home and elsewhere, had not spoken to her for twenty-five years. He was unfriendly to his own brother, Wanton, and his half-brother Roy, and without any apparent reason had ceased speaking to them for a number of years. When Arthur called at his father's home he would go into the latter's room and while engaged in conversation with him would hold and stroke his hand and would speak to no other member of the family. The testator was accustomed to call at the home of his three sons frequently, perhaps several times a week, remaining in friendly conversation for from a few minutes to half an hour. The remarkable feature of these interviews was that for years, after a call upon Arthur or a visit from him, the testator was invariably unkind to and faultfinding with other members of the family. So generally and invariably did this result follow an interview with Arthur that the other members of the family, so the testimony went, could tell from the testator's harshness and unkindness to them that such an interview had taken place. Arthur was the only member of the family who knew the testator had made a will. He knew before the will was made that it was being prepared and brought in his automobile to the Steadman's store one of the witness to the will, Joseph B. Nichols, above referred to.

From the foregoing facts the jury, if they believe the facts, were warranted, in my opinion, in the conclusion that the will was executed under influence unduly exerted upon the testator by attitude of the testator after the interviews with Arthur that the latter had poisoned his father's mind and thereby induced him to make and execute the instrument offered for probate, is an inference from effect to cause and is not an unreasonable one. This inference is made more reasonable in view of the inveterate and apparently causeless hostility of Arthur to his mother and brothers, and is strengthened and made almost the only possible reference from the fact that there is no reason apparent in the testimony, except the cupidity and hatred of Arthur, for the preference shown in the will to him over his brothers, and for the neglect of the testator to make adequate provision for his wife.

There were a large number of witnesses, neighbors and acquaintances, more or less casual, who testified to the mental capacity of Wanton R. Carpenter and to his shrewdness and ability to drive a good bargain. This testimony was lay testimony, even the testimony of one of the witnesses who was a doctor not being expert testimony. There was some testimony,

part of which has been heretofore referred to, which tendered to show that Mr. Carpenter had failed rapidly and noticeably in the few years preceding the making of the will. On the whole, however, it cannot be stated, it seems to me, that the evidence preponderates against the testamentary capacity of the testator, but in my opinion the fact is established by a fair preponderance of the testimony that he was so weakened mentally at the time the will was made as to be the easy victim of unscrupulous machination, and that he was such a victim.

The motion is, therefore, denied upon the ground, first, that the will was not executed according to the forms prescribed by the statute and, second, that it was procured to be made and signed through the undue influence of Arthur B. Carpenter.

For Contestants: Judge Watts and C. A. Walsh.

For Proponents: Samuel Davis and Tillinghast & Collins.